**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| BROOKE WILSON | : | |
| 1080 Cannonade Ct. | : | |
| Gahanna, Ohio 43230 | : | |
| | : | CASE NO. |
| Plaintiff, | : | |
| | : | |
| v. | : | JUDGE |
| | : | |
| CITY OF COLUMBUS | : | |
| 90 West Broad St. | : | **COMPLAINT** |
| Columbus, OH 43215 | : | |
| | : | **JURY DEMAND ENDORSED HEREON** |
| Defendant. | : | |

<u>**COMPLAINT**</u>

Now comes Plaintiff Brooke Wilson, by and through counsel, and for his Complaint against Defendant City of Columbus, hereby states as follows:

<u>**PARTIES**</u>

1.     Plaintiff Brooke Wilson (hereinafter "Mr. Wilson") is an individual residing in Franklin County, Ohio and was at all times relevant herein an employee of Defendant City of Columbus, assigned to the Department of Public Safety, Division of Police.

2.     Defendant City of Columbus (hereinafter also referred to "CPD") is a political subdivision of the State of Ohio located in Franklin County, Ohio and was at all times relevant herein an employer of Plaintiff Brooke Wilson.

<u>**JURISDICTION AND VENUE**</u>

3.     Subject-matter jurisdiction over this action is conferred pursuant to 28 U.S.C. § 1331 because the action arises under the laws of the United States, and supplemental jurisdiction over the Plaintiff's state law claims is conferred pursuant to 28 U.S.C. § 1367 because the federal

1

and state law claims form part of the same case or controversy under Article III of the United States Constitution.

4.　　Venue is proper in the United States District Court for the Southern District of Ohio, Eastern Division, because the Plaintiff was employed by the City of Columbus in Franklin County, Ohio. Venue is further proper in this judicial district pursuant to 28 U.S.C. §1391(b)(2) as a substantial part of the events or omissions giving rise to the claims occurred within the Southern District of Ohio.

5.　　Mr. Wilson has complied with all jurisdictional prerequisites to the filing of this lawsuit and this Complaint is filed within ninety (90) days of Plaintiff's receipt of his Right to Sue letter from the Equal Employment Opportunity Commission which is attached as Exhibit A. Ms. Wilson also filed a charge of discrimination with the Ohio Civil Rights Commission on or about October 6, 2022 and has requested a Right to Sue letter.

## GENERAL ALLEGATIONS

6.　　Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint as if fully rewritten herein.

7.　　Plaintiff Brooke Wilson is a 56-year-old (DOB: 02/24/1966) white male.

8.　　The City of Columbus is an employer with fifteen or more employees.

9.　　Mr. Wilson was hired by the City of Columbus, Department of Public Safety for the Columbus Division of Police ("CPD") as a Police Officer on October 16, 1988. He was promoted to Police Sergeant on August 21, 1994. Mr. Wilson became the supervisor of the Accident Investigations Unit ("AIU") within the Traffic Bureau on September 5, 2010.

10.     Mr. Wilson was highly successful in his position, either personally conducting or overseeing 1,154 major cases involving 702 traffic deaths for the Traffic Bureau. Mr. Wilson had no history of discipline during his thirty-three years on the force.

11.     On May 22, 2020, Mr. Wilson met Cadet Victoria Dameron, a young, black, female intern, when she was assigned to the AIU through the Cadet program. Mr. Wilson and Ms. Dameron worked together in the AIU for less than two weeks and had minimal contact.

12.     Mr. Wilson tried to be helpful to Ms. Dameron offering pointers on essential skills that he believed would be useful for Ms. Dameron's career with CPD. He explained the importance of map reading skills, made sure she had a telephone roster, computer access, Outlook access, and gave her copies of old crash reconstruction investigations to review to assist with her internship. He also advised her of the officer pay scale and told her to review the officer contracts provided by CPD as they were a good resource for officers.

13.     Mr. Wilson later learned that Ms. Dameron viewed his attempts to help train and support her as "pretentious," condescending, "intruding on [her] space," and "uncalled for."

14.     The spring of Ms. Dameron's internship was during the peak of the Black Lives Matter (BLM) protests, so tensions were very high between the police and the public.

15.     On June 5, 2020, Lieutenant William Laff, from the Internal Affairs Bureau ("IAB"), informed Mr. Wilson that he was being investigated for use of a racial slur in the presence of Ms. Dameron. The Complaint indicated that Ms. Dameron told another black Officer, Wilber James—who informed her that it was common for tenured black officers at CPD to keep logs of racist things or "microaggressions" that were said by white officers—that on June 3, 2020, around 3:40 or 3:45 p.m., Mr. Wilson stated, "what are you gonna [sic] do when your [sic] an officer

3

working the protest and a protester calls your [sic] a n***er." Officer James reported what Ms. Dameron told him to Sergeant Alli, another black female officer.

16.    On June 3, 2020, Mr. Wilson's shift ended at 2:00 p.m. and he did not work any overtime that day. He was not at work and was not present when he was alleged to have made such a statement at 3:40 p.m. or 3:45 p.m. on that date. Additionally, Mr. Wilson had never said a racial slur to or towards Ms. Dameron.

17.    Mr. Wilson had a conversation with Ms. Dameron on June 4, 2020, during which they discussed the ongoing protests and his experiences policing such protests. Mr. Wilson mentioned that he felt it was "bizarre" standing next to black, white, male, and female officers and having people scream that they were "racist killers." He also mentioned that he believed it would be hard for the black officers on the force and wanted to have an open discussion about the ongoing anti-police rhetoric with Ms. Dameron, who was thinking of joining the force.

18.    On June 12, 2020, Mr. Wilson was contacted by IAB Sergeant Shannon Johnson, who was assigned to investigate the EEO violation alleged by Ms. Dameron. Sgt. Johnson provided Mr. Wilson with an audio recording of an interview she and Assistant Safety Director Kathleen Bourke had conducted with Ms. Dameron about the alleged incident. During this recording, Ms. Dameron consistently and derisively referred to Mr. Wilson by his demographics—referring to him as a "middle-aged white man," "middle-aged white male," "this man," or one of the "old dudes" assigned to the Accident Investigation Unit.

19.    On June 15, 2020, Mr. Wilson was interviewed by Sgt. Johnson and Kathleen Bourke, the Director of EEO Compliance for the Department of Public Safety. Asst. Dir. Bourke initially permitted Mr. Wilson to read onto the record his prepared statement which outlined his position and recollection of events, as well as Ms. Dameron's repeated derisive references to his

4

age, race, and gender. However, Asst. Dir. Bourke repeatedly stopped Mr. Wilson whenever he spoke of his objections to Ms. Dameron's race, gender, and age-based remarks aimed at him. Despite not allowing Mr. Wilson to read his prepared statement, Sgt. Johnson and Asst. Dir Bourke recessed the recorded interview and read copies of Mr. Wilson's statement as Asst. Dir. Bourke asserted "we will introduce your statement into evidence…." Upon reconvening the recorded interview, Asst. Dir Bourke confirmed that Mr. Wilson would "provide a copy of [the written statement] once [he] clean[ed] up a couple of typos" for submission as evidence.

20.    On or about June 16, 2020, Mr. Wilson emailed a .pdf copy of his prepared statement to Sgt. Johnson. This document contained Mr. Wilson's objections to Ms. Dameron's biased targeting of Mr. Wilson's race, sex, and age; information regarding his absence from the office when he was alleged to have made an objectionable comment to Ms. Dameron; and identified and provided contact information for other minority officers who worked or had worked with Mr. Wilson in the Accident Investigation Unit. This document would be withheld from Mr. Wilson's reviewing chain of command and its contents would be ignored in both Sgt. Johnson's and Asst. Dir. Bourke's investigation as well as their respective findings and recommendations.

21.    On June 16, 2020, a follow-up interview was conducted with Ms. Dameron. She again derisively referred to Mr. Wilson by his age, race, and gender without any comment from Asst. Dir. Bourke or Sgt. Johnson.

22.    Between June 23, 2020 and July 9, 2020, Sgt. Johnson and Asst. Dir. Bourke interviewed eight AIU officers and two Internal Bureau Sergeants about the alleged incident. None of the personnel interviewed reported having heard the statement alleged to have been made by Mr. Wilson. They were also asked about Mr. Wilson's character and reported that it would have been completely out of his character to use any racially inflammatory language.

23.     In an effort to clear his name, Mr. Wilson agreed to take a polygraph examination regarding the alleged incident. On July 24, 2020, Mr. Wilson reported to the CPD Polygraph Unit where he was asked four questions by CPD Polygraphist Randy Stonerock.

24.     Mr. Stonerock reported that there was "deception indicated" in Mr. Wilson's responses. After the polygraph, Mr. Wilson told everyone he had been truthful. Asst. Dir. Bourke stated that the polygraph would be reviewed by an outside party.

25.     On August 10, 2020, Ohio Highway Patrol Sgt. Gamel Brimah reviewed the polygraph and told IAB that the polygraph exam was not in a customary format. Neither Asst. Dir. Bourke nor Sgt. Johnson followed up with Sgt. Brimah to clarify the validity of the polygraph. The atypical nature of the polygraph questioning would never be addressed by Asst. Dir. Bourke in her findings and recommendations.

26.     On August 27, 2020, Mr. Wilson had a second interview with the investigation team. He reiterated that the polygraph test was conducted improperly, that the results were unreliable, and that he had been truthful. Asst. Dir. Bourke would not entertain a discussion regarding the validity or admissibility of the polygraph, and this additional information was not acknowledged in her findings and recommendations. Sgt. Johnson also failed to consider this additional information in her findings and recommendations.

27.     Following the second interview, numerous IAB summaries were submitted by Sgt. Johnson and Asst. Dir. Bourke analyzing the investigation as it existed up to that point. Most of the documents discussed how Ms. Dameron felt, failing to mention or offer any analysis of her ongoing animus towards Mr. Wilson. The summaries also lacked any corroborating evidence to support Ms. Dameron's allegation. Asst. Dir. Bourke concluded that "the preponderance of the

evidence" supported that Mr. Wilson had used a racial slur, without discussing any admissible evidence supporting this conclusion.

28.     On or about September 30, 2020, Sgt. Johnson forwarded a first draft of the Internal Affairs Bureau investigation with her "Recommendation of Finding" that Mr. Wilson had violated the City's EEO policy. Although Sgt. Johnson forwarded her findings on September 30, 2020, the City would continue its investigation until February 17, 2021.

29.     On October 2, 2020, Asst. Dir. Bourke added her findings to the first draft of the Internal Affairs investigation. She concluded that Mr. Wilson had violated the City's EEO policy. Although Asst. Dir. Bourke forwarded her findings on October 2, 2020, the City would continue its investigation until February 19, 2021.

30.     On or about October 5, 2020, Lieutenant Marc Dopp, part of Mr. Wilson's chain of command, informed him that the EEO complaint against Mr. Wilson would be sustained, despite the inadmissibility of the polygraph pursuant to Article 8.11(A) of the Collective Bargaining Agreement and the uncorroborated allegations. Lt. Dopp also stated that "there was no doubt in my mind that the allegation was false," but that because the Safety Director, Mr. Pettus, an African American, wanted the allegation against Mr. Wilson sustained, "they had no choice."

31.     The following day, Lt. Dopp recommended the allegation against Mr. Wilson be sustained. No evidence was presented corroborating the allegation and no analysis of the investigation was ever completed by Lt. Dopp before rendering the recommendation, a deviation from established practices. Although Lt. Dopp forwarded his findings on October 6, 2020, the City would continue its investigation until February 17, 2021.

32.     On October 20, 2022, the allegation against Mr. Wilson was sustained by the Deputy Chief, based on the first draft of the investigation. The Discipline Grievance Lieutenant

7

was instructed to draft departmental charges against Mr. Wilson, nearly four months before the investigation would be completed.

33.     On November 6, 2020, 15 days after the decision was made to sustain the allegation against Mr. Wilson, but 17 days before he was departmentally charged, the Division of Police revised Rule of Conduct 1.48 to add language stating that anyone who violated this subsection would be suspended or terminated. The City would retroactively apply this new rule to Mr. Wilson's case.

34.     On November 23, 2020, based on the first draft of the investigation, Mr. Wilson was officially charged with two violations of the Division Rules of Conduct: R.O.C. 1.36 "Unbecoming Conduct" and R.O.C. 1.48 "Compliance with EEO Laws, Rules, Order, Policies, and Directives." The investigation would not be completed for nearly three more months.

35.     The draft IAB investigation report that was reviewed by the entire police chain of command leading to the recommendation of departmental charges excluded Mr. Wilson's prepared statement from the June 15, 2020 interview, wherein he articulated Ms. Dameron's age/race/sex animus towards him as well as his absence from the AIU offices at the time which Ms. Dameron alleged he made the statement precipitating the incident. Mr. Wilson's prepared statement was never referenced, although both Sgt. Johnson and Asst. Dir. Bourke reviewed hard copies of it during his first interview and received electronic copies of the document within days of that same interview.

36.     On December 15, 2020, the City's investigation continued as the Discipline Grievance Liaison Lieutenant Jeffrey Lipp requested additional information from Ohio Highway Patrol Sgt. Brimah with respect to Sgt. Brimah's August 10, 2020 opinion that the question format

used in Mr. Wilson's polygraph examination was irregular. It would be three days before the City received a response.

37.    On December 16, 2020, two months before the investigation would be complete, the Chief of Police held a hearing on the departmental charges against Mr. Wilson. During this hearing, Mr. Wilson was permitted to read a prepared statement and provide timekeeping records that demonstrated he was not on duty or in the AIU offices at the time he was alleged to have made the statement to Ms. Dameron. This was the first time the Chief of Police learned that Mr. Wilson had not been present at the time of the alleged statement and that his June 15, 2020 statement to Asst. Dir. Bourke and Sgt. Johnson had been omitted from the investigation that he, and the entire Division of Police, had reviewed prior to making the decision to departmentally charge Mr. Wilson. The Chief acknowledged the polygraph examination was contractually inadmissible and stated he would not consider it.

38.    On December 17, 2020, the Chief sustained the departmental charges and issued a recommendation to the Director of Public Safety that Mr. Wilson be suspended for 64 hours, 32 hours for each of the two charges, to be served concurrently. This decision was offered without any justification or support and was made 63 days before the investigation would be completed.

39.    On December 18, 2020, Ohio Highway Patrol Sgt. Brimah responded to CPD's December 15, 2020 inquiry. Sgt. Brimah stated "The [standard] Air Force MGQT (Modified General Question Test) test format allows the examiner to ask multiple relevant test questions within the same test chart related to a *single incident*. In this case, the examiner asked several different relevant test questions (that *we assume are from the same incident*) . . . ." (emphasis added). This indicates the City withheld from Sgt. Brimah that Mr. Wilson was asked about two distinct statements in two unrelated conversations which were separated in time by 13 days. Sgt.

9

Brimah continued that "there is no known published research of a testing format where the relevant test questions within the same test chart contains (sic) both a 'yes' and a 'no' response. Therefore, administering a test that incorporates both 'yes' and a 'no' response opens up the possibility of reduced accuracy and *questions regarding the test validity*." (emphasis added). Lt. Lipp alerted neither the Chief of Police nor Mr. Wilson's chain of command to this new evidence. He forwarded Sgt. Brimah's report to Sgt. Johnson with instructions to add it "to the Wilson file."

40. Over the following two months, the investigation continued as the City gathered evidence related to the IAB investigation and allegations against Mr. Wilson, including timesheet records for June 3, 2020, emails regarding the invalidity of the polygraph exam, Matrix key-card usage reports, and timesheets. The timesheets verified that Mr. Wilson worked on June 3, 2020, from 6:00 a.m. until 2:00 p.m., with no overtime, and that Ms. Dameron worked from 8:00 a.m. until 4:00 p.m.

41. On February 17, 2021, Lt. Lipp forwarded to Sgt. Johnson an opinion he had obtained from CPD polygraph examiner Stonerock wherein Mr. Stonerock acknowledged the criticism offered by Sgt. Brimah that the question format was irregular and not supported by published studies. Mr. Stonerock nonetheless defended the use of this particular question format on the basis that it was how he had done it in the past. Mr. Stonerock did not indicate he was ever made aware he had posed questions based on two distinct conversations separated by 13 days. This communication marked the conclusion of the City's investigation.

42. On April 5, 2021, Mr. Wilson received a notice from Safety Director Pettus that Mr. Wilson was to have a hearing on the departmental charges on April 15, 2021. The notice included the completed IAB investigation which contained transcripts from the Chief's disciplinary hearing, Mr. Wilson's original prepared statement, Chief Quinlan's findings and

recommendation, the polygraph email chain containing a polygraphist's opinion from an outside agency indicating the polygraph administered to Mr. Wilson was not valid, and documents related to key-card entries and timesheets. The completed investigation also contained a comprehensive Table of Contents that reflected this new evidence, but there was no other acknowledgement that the complete investigation differed from the first draft. Sgt. Johnson's findings remained unchanged, without an analysis or even a reference to the new evidence. Asst. Dir. Bourke's findings were unchanged and there was no indication she ever learned of the new evidence. There is no indication anyone in Mr. Wilson's chain of command (including the Chief of Police), who has made recommendations based on the first draft, ever saw the final investigation or learned of the new evidence.

43.    During the Director's hearing on April 15, 2021, Mr. Wilson was permitted to read a prepared statement. The Division of Police acknowledged that the polygraph was inadmissible, and the allegation was otherwise uncorroborated.

44.    On April 16, 2020, the Public Safety Director offered to reduce Mr. Wilson's suspension to 16 hours served and 16 hours held in abeyance, provided there were no other offenses within the next year. In exchange, Mr. Wilson would have to forgo his right to arbitration. Mr. Wilson declined the offer and stated that he intended to take the case to arbitration.

45.    On April 19, 2021, the FOP president approved Mr. Wilson's request for arbitration and notified the Safety Director.

46.    On April 21, 2021, Safety Director Pettus imposed a 64-hour suspension on Mr. Wilson and added that he would be immediately demoted to the position of police officer, which is an unprecedented act not permitted by the CBA.

47.     Pursuant to Article 10.3 of the CBA, demotion is only permitted for sustained allegations of insubordination, with which Mr. Wilson was never charged. Mr. Wilson was immediately demoted to the rank of Police Officer and remained assigned to the Accident Investigation Unit, with duty hours of 8:30 a.m. to 4:30 p.m., with Saturdays and Sundays off. Mr. Wilson continued to pursue the grievance.

48.     On April 22, 2021, the Deputy Chief of Police, upon informing Mr. Wilson of the demotion, told him that he may still be able to retain the rank of Police Sergeant if he were to resign by the end of the day. When Mr. Wilson refused to resign, the City of Columbus began taking actions against Mr. Wilson designed to force him out.

49.     On May 5, 2021, Mr. Wilson was told by a Deputy Chief of Police to apply for and accept a new position by July 10, 2021, or else he would be administratively reassigned to an unspecified assignment of the Division's choosing, despite Article 11.3(C)(3) of the CBA which prohibits Mr. Wilson from applying for or being accepted for an assignment transfer until April 21, 2022, due to his suspension on April 21, 2021. Mr. Wilson would still not resign.

50.     Mr. Wilson was administratively reassigned from the Traffic Bureau to the Wellness Bureau and ordered to a new reporting location (Police Headquarters). The City was aware at the time that such reassignment was outside the scope of CBA Article 11.4. Mr. Wilson was given four hours to vacate the office that he had occupied for 11 years. Mr. Wilson would still not resign.

51.     Mr. Wilson checked the Division of Police timekeeping program and discovered the record had been altered and the time he worked in the AIU from May 2nd through May 5th had been removed.

52. On May 6, 2021, Mr. Wilson, as ordered, reported for duty at his new assignment in Police Headquarters. The City humiliated Mr. Wilson by forcing him to be seen in Police Headquarters wearing the identification card and badge of a reduced rank, publicizing his demotion, despite his prior 27 years as a Police Sergeant. Further, Mr. Wilson had been ordered to complete his outstanding AIU case load, but all his necessary computer access had been shut off due to his reassignment. Some of the resources he needed only existed in the AIU offices, to which Mr. Wilson no longer had free access. Mr. Wilson would still not resign.

53. On May 7, 2021, Mr. Wilson went by the AIU offices before reporting for duty in Police Headquarters. He discovered that his remaining possessions were removed from his AIU office, although no one was yet designated to occupy the office. He further discovered that City personnel had printed a copy of the Personnel Database summary sheet highlighting his demotion and taped it to a file cabinet next to the entry door to the common office area. Mr. Wilson would still not resign.

54. Mr. Wilson forwarded a memorandum to the Chief of Police requesting a detailed explanation for the reasons of the May 5, 2021 administrative reassignment. The Chief of Police refused to provide an explanation, despite being required to do so by CBA Article 11.4. Mr. Wilson would still not resign.

55. On May 12, 2021, Mr. Wilson filed a Step 3 Grievance, pursuant to CBA Article 12.5(C), related to his May 5, 2021 administrative reassignment.

56. On May 20, 2021, Mr. Wilson checked his pay statement and discovered that the City had not credited his available leave balance for the prior two pay-periods. He further received notice from the FOP that the Safety Director's Office had intervened in his pending Step 3 Grievance, demanding that no Step 3 Grievance be heard, and that the grievance instead be refiled

as a Step 4 to be heard by the Safety Director. This is a deviation from CBA Article 12.5. Mr. Wilson would still not resign.

57.     On May 21, 2021, Mr. Wilson was notified by the City that he was not permitted to instruct Death Notification Training (DNT) that was scheduled for Mothers Against Drunk Driving. Mr. Wilson was the only qualified DNT instructor in the State of Ohio and held this standing independent of his rank or assignment. Mr. Wilson had been permitted by the City to teach these courses for the prior seven years. The reason for the denial was that Mr. Wilson had a "pending grievance." No explanation was given as to how or why a pending grievance would preclude Mr. Wilson from serving as an outside police instructor. Mr. Wilson ultimately took 24 hours of vacation leave to fulfill his standing instructor obligations. Mr. Wilson would still not resign.

58.     On May 27, 2021, Mr. Wilson attended a Step 4 Grievance Hearing at the Safety Director's office, wherein he articulated how the City failed to comply with the CBA by administratively reassigning him.

59.     On June 1, 2021, the new AIU Supervisor contacted Mr. Wilson to request a list of committees/meetings required by the AIU supervisor. Mr. Wilson prepared a detailed list, including meeting schedules and venues. Mr. Wilson requested a meeting so that he could provide the new supervisor with a detailed briefing on all the committee work and reporting. The new supervisor refused to meet with Mr. Wilson.

60.     On June 2, 2021, the Division of Police Supervisors began registering personnel for mandatory in-service training that would begin on June 21, 2021. The Division of Police did not schedule Mr. Wilson for this mandatory training. Mr. Wilson would still not resign.

14

61.     On June 3, 2021, Mr. Wilson reviewed his pay statement and discovered that the City, without cause or explanation, seized $1,557.88 of pay earned between December 27, 2020 and January 9, 2021. Mr. Wilson, after the payroll withholding, received a net payment of $0.00. Mr. Wilson would still not resign.

62.     On June 4, 2021, the Director of Public Safety issued his ruling on Mr. Wilson's grievance. The Director, who had not attended the May 27th grievance hearing, failed to address or acknowledge any of the contractual issues raised by Mr. Wilson. The Director denied the grievance on the grounds that Mr. Wilson's administrative reassignment was a direct result of his earlier demotion in rank, by order of the Safety Director himself. The Director declined to provide any existing contractual provision or past practice that would have permitted the Director to administratively reassign any Police personnel. Mr. Wilson would still not resign.

63.     On June 24, 2021, the Division of Police supervisors began registering personnel for mandatory Phase I and Phase III Firearms training that would begin on July 19, 2021. The Division of Police did not schedule Mr. Wilson for this mandatory training. Mr. Wilson would still not resign.

64.     On July 14, 2021, Mr. Wilson received an email informing him that he was again administratively reassigned to the Patrol Bureau, effective July 25, 2021. He would be working either 2:00 p.m. to 10:00 p.m. or 3:00 p.m. to 11:00 p.m., with Wednesdays and Thursdays off. His reporting location was unspecified. Mr. Wilson has a minor child living at home and this reassignment was in direct conflict with his child-care commitments. The Chief of Police provided no justification, rationale, or prior notice of the administrative reassignment, knowing that it was in violation of SBA Article 11.4. The City neither provided nor offered to provide any training or

remediation to prepare Mr. Wilson to assume an assignment as a Police Officer assigned to Patrol, even though he has not worked in such a capacity for nearly 27 years.

65.     On July 15, 2021, as a result of the sustained harassment by the City, and his reassignment to work unspecified evening hours with Wednesdays and Thursdays off, Mr. Wilson provided written notice that his continued employment with CPD had become intolerable and he was compelled to resign. His resignation became effective 11:59 p.m. on August 7, 2021, 23 days after his notice.

66.     When Mr. Wilson reported to the Police Human Resources Unit for out-processing, he learned that his resignation would not be "in good standing," despite furnishing notice more than two weeks in advance, not being under criminal or internal investigation which could result in termination or suspension greater than 120 hours, and not facing criminal or departmental charges which could result in termination or suspension greater than 120 hours.

67.     Mr. Wilson asked for a copy of the Routing Sheet comments attached to his letter of resignation, but his request was denied. He was told that the Director of Public Safety would have to decide on his separation standing. The City knew at the time that withholding his resignation status of "in good standing" was in violation of Division Directive 8.05. No other CPD employees who had met all the conditions of this policy had ever been required to have their standing determined by the Director of Public Safety. The City was aware that Mr. Wilson was permitted to copy his resignation and Routing Sheet comments pursuant to FOP CBA Article 10.13.

68.     On August 12, 2021, Mr. Wilson received his final pay as a City employee. However, the City withheld all his unused leave balance pay-out totaling $52,440.65, which was required to be paid by CBA Articles 22, 26, 27, and 28. No explanation or justification for this

withholding was offered. Most of the terminal leave pay due was eventually paid on April 22, 2022.

69.     On October 20, 2021, the arbitration hearing was held. Ms. Dameron testified that, at the time of the incident, she was angry about the BLM protests and "was categorizing everyone in terms of black lives matter or they don't." She further stated that she viewed Mr. Wilson "as black lives don't matter" and that she "could not get away from the BLM conflict." She then stated that Mr. Wilson asked her, "If you were out there it could have been you. What would you do if someone shouted n***er at you?" On cross-examination, Mr. Dameron stated that Mr. Wilson called her a "n***er."

70.     When Ms. Dameron was asked about the discrepancy in her testimony, she denied that she misspoke or that there was any discrepancy between her statements. Officer Wilbert James testified that Ms. Dameron confided this incident to him during a conversation at the Police Academy. Officer James then went and reported the incident to Sgt. Alli.

71.     The evidence and testimony presented at the arbitration showed that the alleged statement was completely inconsistent with Mr. Wilson's prior behavior and character during his 33 years on the force. The invalidity and inadmissibility of the polygraph were barely discussed and was in fact used to support the allegation.

72.     The representative from the Department of Public Safety testified that the Safety Director considered the mere fact that Mr. Wilson prepared a statement for his first interview as evidence that Mr. Wilson must have been untruthful. He also testified that, in considering the level of discipline to be issued, the Safety Director considered Mr. Wilson pointing out Ms. Dameron's repeated animus against his age, race, and sex as a factor used against him. The Safety Director

determined that Mr. Wilson's assertion that he was a victim of age/race/sex animus indicated that he was trying to "blame" Ms. Dameron, thus warranting more severe discipline.

73.     The Arbitrator denied Mr. Wilson's grievance on February 14, 2022.

74.     Given the social and political context surrounding Ms. Dameron's allegation, Mr. Wilson was wrongfully accused because of his race, gender, and age and then made an example of based on his race, gender, and age.

**COUNT I**
**RACE AND SEX DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 2000e-2(a)**

75.     Mr. Wilson re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint as if fully rewritten herein.

76.     42 U.S.C. § 2000e-2(a)(1) makes it unlawful for an employer to discriminate against an employee with respect to his compensation, terms, conditions, or privileges of employment, because of such employee's race or sex.

77.     The City was an employer of Mr. Wilson at all relevant times herein, as defined by 42 U.S.C. § 2000e(b).

78.     Mr. Wilson was an employee of the City at all relevant times herein, as defined by 42 U.S.C. § 2000e(f).

79.     Mr. Wilson is a white male.

80.     The background circumstances of Mr. Wilson's employment support the inference that the City is the unusual employer who discriminates against white, male employees. The City has been very vocal about its desire to increase "diversity and inclusion" within the Division of Police. This diversity has been sought through the net reduction of those whom the City sees as having been traditionally overrepresented in the police force. The very existence of the Police Cadet program, overseen by CPD's Minority Recruiting Unit, is to further recruitment of youthful,

non-white, non-male police applicants. To combat any form of apparent racism, especially during the political and social climate of George Floyd protests, the City has been treating older, white, male officers more harshly, subjecting them to stricter penalties and holding them to a different set of standards.

81.     The City took numerous adverse employment actions against Mr. Wilson including, but not limited to, demoting him without precedent or contractual authority and ultimately constructively discharging him from City employment.

82.     The gender, race, and age bias endured throughout the IAB investigation and arbitration, compounded with a suspension, a public demotion, two reassignments, and the City's unilateral suspension of his contractual protections caused such a toxic work environment that Mr. Wilson was constructively discharged on July 15, 2021, with his last day of work being August 7, 2021.

83.     The City constructively discharged Mr. Wilson by making his working conditions so intolerable that a reasonable person under the same or similar circumstances would have felt compelled to resign. The negativity and humiliation that Mr. Wilson faced, coupled with his inability to work a shift compatible with his long-standing family obligations, made Mr. Wilson's work environment so intolerable that he acted reasonably under the circumstances in submitting his resignation.

84.     Mr. Wilson was qualified for his position at CPD as he had been, among other things, serving as a sergeant in the Traffic Bureau, supervising the AIU since 2010, and received no discipline during his thirty-three years with CPD.

85.     Mr. Wilson was treated differently from other similarly situated minority employees.

86. The City cannot proffer a legitimate, nondiscriminatory justification for subjecting Mr. Wilson to this adverse employment action.

87. Any proffered reasons given by the City for subjecting Mr. Wilson to discriminatory treatment and adverse employment actions are pretextual.

88. The City acted intentionally and with malice or reckless indifference as to Mr. Wilson's protected rights.

89. The City's discriminatory treatment of Mr. Wilson has resulted in significant compensatory damages including, but not limited to, lost wages and fringe benefits, diminished job opportunities, as well as anxiety and emotional distress.

90. As a result, the City has violated 42 U.S.C. § 2000e-2(a)(1) by discriminating against Mr. Wilson on the basis of his race and sex

## COUNT II
## AGE DISCRIMINATION IN VIOLATION OF 29 U.S.C. § 623

91. Mr. Wilson re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint as if fully rewritten herein.

92. 29 U.S.C. § 623(a)(1) makes it unlawful to discriminate against an individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age.

93. At all times relevant herein, Defendant City of Columbus was an employer within the meaning of 29 U.S.C. § 630(b).

94. At all times relevant herein, Mr. Wilson was an employee of Defendant City of Columbus within the meaning of 29 U.S.C. § 630(f).

95. Mr. Wilson is 56 years old (DOB: 02/24/1966), and as such, he is a member of a protected class based on his age pursuant to 29 U.S.C. § 631(a).

20

96.     The City took numerous adverse employment actions against Mr. Wilson including, but not limited to, demoting him without precedent or contractual authority and ultimately constructively discharging him from City employment, in violation of 29 U.S.C § 623(a)(1).

97.     The gender, race, and age bias endured throughout the IAB investigation and arbitration, compounded with a suspension, a public demotion, two reassignments, and the City's unilateral suspension of his contractual protections caused such a toxic work environment that Mr. Wilson was constructively discharged on July 15, 2021, with his last day of work being August 7, 2021.

98.     The City constructively discharged Mr. Wilson by making his working conditions so intolerable that a reasonable person under the same or similar circumstances would have felt compelled to resign. The negativity and humiliation that Mr. Wilson faced, coupled with his inability to work a shift compatible with his long-standing family obligations, made Mr. Wilson's work environment so intolerable that he acted reasonably under the circumstances in submitting his resignation.

99.     Mr. Wilson was qualified for his position at CPD as he had been, among other things, serving as a sergeant in the Traffic Bureau, supervising the AIU since 2010, and has received no discipline during his thirty-three years with CPD.

100.    The City treated Mr. Wilson less favorably than other younger similarly situated employees.

101.    The City cannot proffer a legitimate, nondiscriminatory justification for subjecting Mr. Wilson to this adverse employment action.

102.    Any alleged justification for the adverse employment actions taken by the City is pretextual.

103.    The City's discriminatory treatment of Mr. Wilson has resulted in significant compensatory damages including, but not limited to, lost wages and fringe benefits, diminished future job opportunities, as well as anxiety and emotional distress.

104.    The City committed a willful violation by knowing its actions violated 29 U.S.C. § 623(a)(1), or by showing a reckless disregard as to whether its actions violated 29 U.S.C. § 623(a)(1).

105.    As a result, the City violated 29 U.S.C. § 623(a)(1) by discriminating against Mr. Wilson on the basis of his age.

## COUNT III
## AGE DISCRIMINATION IN VIOLATION OF R.C. 4112.02(A)

106.    Mr. Wilson re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint as if fully rewritten herein.

107.    R.C. § 4112.02(A) makes it unlawful for an employer to discharge or otherwise discriminate against any employee on the basis of the person's age with respect to the tenure, terms, conditions, or privileges of that person's employment.

108.    Defendant City of Columbus is an employer within the meaning of R.C. § 4112.01(A)(2).

109.    At all times relevant herein, Mr. Wilson was an employee of the City within the meaning of R.C. § 4112.01(A)(3).

110.    Mr. Wilson is 56 years old (DOB: 02/24/1966), and is thus a member of a protected class based on his age.

111.    Mr. Wilson was qualified for his position at CPD as he had been, among other things, serving as a sergeant in the Traffic Bureau, supervising the AIU since 2010, and has received no discipline during his thirty-three years with CPD.

22

112.    The City took numerous adverse employment actions against Mr. Wilson including, but not limited to, demoting him without precedent or contractual authority and ultimately constructively discharging him from City employment.

113.    The gender, race, and age bias endured throughout the IAB investigation and arbitration, compounded with a suspension, a public demotion, two reassignments, and the City's unilateral suspension of his contractual protections caused such a toxic work environment that Mr. Wilson was constructively discharged on July 15, 2021, with his last day of work being August 7, 2021.

114.    The City constructively discharged Mr. Wilson by making his working conditions so intolerable that a reasonable person under the same or similar circumstances would have felt compelled to resign. The negativity and humiliation that Mr. Wilson faced, coupled with his inability to work a shift compatible with his long-standing family obligations, made Mr. Wilson's work environment so intolerable that he acted reasonably under the circumstances in submitting his resignation.

115.    The City treated Mr. Wilson less favorably than younger, similarly situated employees.

116.    The City cannot proffer a legitimate, nondiscriminatory justification for subjecting Mr. Wilson to the adverse employment actions taken against him.

117.    Any alleged justification for the adverse employment actions taken by the City is pretextual.

118.    The City acted with malice or with reckless indifference as to Mr. Wilson's protected rights.

119.    The City's discriminatory treatment of Mr. Wilson has resulted in significant compensatory damages including, but not limited to, lost wages and fringe benefits, diminished future job opportunities, as well as anxiety and emotional distress.

120.    As a result, the City violated 4112.02(A) by discriminating against Mr. Wilson on the basis of his age.

**COUNT IV**
**AGE DISCRIMINATION IN VIOLATION OF R.C. 4112.14**

121.    Mr. Wilson re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint as if fully rewritten herein.

122.    R.C. 4112.14 makes it unlawful to discharge without just cause any employee forty years or older who is otherwise able to perform the duties of his job.

123.    Defendant City of Columbus is an employer within the meaning of 4112.01(A)(2).

124.    At all relevant times herein, Mr. Wilson was an employee within the meaning of 4112.01(A)(3).

125.    Mr. Wilson is 56 years old (DOB: 02/24/1966), and as such, he is a member of a protected class based on his age pursuant to RC 4112.14(A).

126.    Mr. Wilson was qualified for his position at CPD as he had been, among other things, serving as a sergeant in the Traffic Bureau, supervising the AIU since 2010, and has received no discipline during his thirty-three years with CPD.

127.    The City took numerous adverse employment actions against Mr. Wilson including, but not limited to, demoting him without precedent or contractual authority and ultimately constructively discharging him from City employment.

128.    The gender, race, and age bias endured throughout the IAB investigation and arbitration, compounded with a suspension, a public demotion, two reassignments, and the City's

unilateral suspension of his contractual protections caused such a toxic work environment that Mr. Wilson was constructively discharged on July 15, 2021, with his last day of work being August 7, 2021.

129.    The City constructively discharged Mr. Wilson by making his working conditions so intolerable that a reasonable person under the same or similar circumstances would have felt compelled to resign. The negativity and humiliation that Mr. Wilson faced, coupled with his inability to work a shift compatible with his long-standing family obligations, made Mr. Wilson's work environment so intolerable that he acted reasonably under the circumstances in submitting his resignation.

130.    The City, upon information and belief, replaced Mr. Wilson with a person substantially younger than him, or his discharge permitted the retention of a person substantially younger than him.

131.    The City cannot proffer a legitimate, nondiscriminatory justification for subjecting Mr. Wilson to the adverse employment actions taken against him.

132.    Any alleged justification for the adverse employment actions taken by the City is pretextual.

133.    The City acted intentionally, with malice, or with reckless indifference as to Mr. Wilson's protected rights.

134.    The City's discriminatory treatment of Mr. Wilson has resulted in significant compensatory damages including, but not limited to, lost wages and fringe benefits, diminished future job opportunities, as well as anxiety and emotional distress.

135.    As a result, the City violated R.C. 4112.14.

<u>**COUNT V**</u>
<u>**SEX AND RACE DISCRIMINATION IN VIOLATION OF R.C. 4112.02(A)**</u>

136.    Mr. Wilson re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint as if fully rewritten herein

137.    R.C. § 4112.02(A) makes it unlawful for an employer to discharge or otherwise discriminate against any employee on the basis of the person's sex and race with respect to the tenure, terms, conditions, or privileges of that person's employment.

138.    Defendant City of Columbus is an employer within the meaning of R.C. § 4112.01(A)(2).

139.    At all times relevant herein, Mr. Wilson was an employee of the City within the meaning of R.C. § 4112.01(A)(3).

140.    Mr. Wilson is a white male.

141.    The background circumstances of Mr. Wilson's employment support the inference that the City is the unusual employer who discriminates against white, male employees. The City has been very vocal about its desire to increase "diversity and inclusion" within the Division of Police. This diversity has been sought through the net reduction of those whom the City sees as having been traditionally overrepresented in the police force. The very existence of the Police Cadet program, overseen by CPD's Minority Recruiting Unit, is to further recruitment of youthful, non-male, non-white police applicants. To combat any form of apparent racism, especially during the political and social climate of George Floyd protests, the City has been treating older, white, male officers more harshly, subjecting them to stricter penalties and holding them to a different set of standards

142.    The City took numerous adverse employment actions against Mr. Wilson including, but not limited to, demoting him without precedent or contractual authority and ultimately constructively discharging him from City employment.

143.    The gender, race, and age bias endured throughout the IAB investigation and arbitration, compounded with a suspension, a public demotion, two reassignments, and the City's unilateral suspension of his contractual protections caused such a toxic work environment that Mr. Wilson was constructively discharged on July 15, 2021, with his last day of work being August 7, 2021.

144.    The City constructively discharged Mr. Wilson by making his working conditions so intolerable that a reasonable person under the same or similar circumstances would have felt compelled to resign. The negativity and humiliation that Mr. Wilson faced, coupled with his inability to work a shift compatible with his long-standing family obligations, made Mr. Wilson's work environment so intolerable that he acted reasonably under the circumstances in submitting his resignation.

145.    Mr. Wilson was qualified for his position at CPD as he had been, among other things, serving as a sergeant in the Traffic Bureau, supervising the AIU since 2010, and has received no discipline during his thirty-three years with CPD.

146.    The City treated Mr. Wilson less favorably than similarly situated, minority employees.

147.    The City cannot proffer a legitimate, nondiscriminatory justification for subjecting Mr. Wilson to the adverse employment actions taken against him.

148.    Any alleged justification for the adverse employment actions taken by the City is pretextual.

27

149.    The City acted with malice or with reckless indifference to Mr. Wilson's protected rights.

150.    The City's discriminatory treatment of Mr. Wilson has resulted in significant compensatory damages including, but not limited to, lost wages and fringe benefits, diminished future job opportunities, as well as anxiety and emotional distress.

151.    As a result, the City violated 4112.02(A) by discriminating against Mr. Wilson on the basis of his sex and race.

**COUNT VI**
**RETALIATION IN VIOLATION OF R.C. 4112.02(I)**

152.    Mr. Wilson re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint as if fully rewritten herein.

153.    R.C. 4112.02(I) makes it unlawful for any person to retaliate against another because the individual has opposed any unlawful discriminatory practice.

154.    Mr. Wilson engaged in a protected activity by raising Ms. Dameron's animus against him based on his age, race, and sex as motivating her complaint against him.

155.    The City admittedly used Mr. Wilson's assertion that he was a victim of Ms. Dameron's animus based on his age, race, and sex as a factor for warranting increased discipline against him.

156.    The City retaliated against Mr. Wilson for his complaints that he was targeted by Ms. Dameron because of his age, race, and sex. CPD further retaliated against him when they increased his 32-hour suspension to a suspension and a demotion after he elected to pursue his grievance to arbitration, rather than accept the discriminatory actions taken against him.

157.    The City acted with malice or with reckless indifference to Mr. Wilson's protected rights.

158. The City's retaliatory treatment of Mr. Wilson, based on his complaint that Ms. Dameron's allegations against him were the result of animus towards him on the basis of his race, sex, and age, has resulted in significant compensatory damages including, but not limited to, lost wages and fringe benefits, diminished future job opportunities, as well as anxiety and emotional distress.

159. As a result, the City retaliated against Mr. Wilson in violation of R.C. 4112.02(I).

**WHEREFORE**, Plaintiff Brooke Wilson demands judgment against Defendant City of Columbus as follows:

**Count I – RACE AND SEX DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 2000e-2(a)** – Enter judgment against Defendant for back pay, compensatory damages, and punitive damages, in an amount to be determined at trial but in excess of $75,000, plus prejudgment and post-judgment interest, and such other and further relief this Honorable Court deems appropriate and just, including an award of attorneys' fees and costs.

**Count II – AGE DISCRIMINATION IN VIOLATION OF 29 U.S.C. § 623** – Enter judgment against Defendant for back pay, compensatory damages, and punitive damages, in an amount to be determined at trial but in excess of $75,000, plus prejudgment and post-judgment interest, and such other and further relief this Honorable Court deems appropriate and just, including an award of attorneys' fees and costs.

**Count III – AGE DISCRIMINATION IN VIOLATION OF R.C. 4112.02(A)** – Enter judgment against Defendant for back pay, compensatory damages, and punitive damages, in an amount to be determined at trial but in excess of $75,000, plus prejudgment and post-judgment interest, and such other and further relief this Honorable Court deems appropriate and just, including an award of attorneys' fees and costs.

**Count IV – AGE DISCRIMINATION IN VIOLATION OF R.C. § 4112.14** – Enter judgment against Defendant for back pay, compensatory damages, and punitive damages, in an amount to be determined at trial but in excess of $75,000, plus prejudgment and post-judgment interest, and such other and further relief this Honorable Court deems appropriate and just, including an award of attorneys' fees and costs.

**Count V – SEX AND RACE DISCRIMINATION IN VIOLATION OF R.C. 4112.02(A)** – Enter judgment against Defendant for back pay, compensatory damages, and punitive damages, in an amount to be determined at trial but in excess of $75,000, plus prejudgment and post-judgment interest, and such other and further relief this Honorable Court deems appropriate and just, including an award of attorneys' fees and costs.

**Count VI – RETALIATION IN VIOLATION OF R.C. 4112.02(I)** – Enter judgment against Defendant for back pay, compensatory damages, and punitive damages, in an amount to be determined at trial but in excess of $75,000, plus prejudgment and post-judgment interest, and such other and further relief this Honorable Court deems appropriate and just, including an award of attorneys' fees and costs.

Respectfully submitted,

Judith E. Galeano (0048366) Trial Attorney
Barbara K. Letcher (0046948) (Of Counsel)
Phillip T. Kelly (0102198)
Mowery Youell & Galeano, Ltd.
485 Metro Place South, Suite 220
Dublin, Ohio 43017
Phone: (614) 764-1444
Fax: (614) 760-8654
Email: jgaleano@myglaw.com
Email: bletcher@myglaw.com
Email: pkelly@myglaw.com
*Attorneys for Plaintiff Brooke Wilson*

## JURY DEMAND

Plaintiff demands that a jury decide all claims in this Complaint.

Judith E. Galeano (0048366) Trial Attorney
Barbara K. Letcher (0046948) (Of Counsel)
Phillip T. Kelly (0102198)
Mowery Youell & Galeano, Ltd.
485 Metro Place South, Suite 220
Dublin, Ohio 43017
Phone: (614) 764-1444
Fax: (614) 760-8654
Email: jgaleano@myglaw.com
Email: bletcher@myglaw.com
Email: pkelly@myglaw.com
*Attorneys for Plaintiff Brooke Wilson*

 **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Cleveland Field Office**
1240 E 9th St, Suite 3001
Cleveland, OH 44199
(216) 306-1120
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 09/24/2022

**To:** Brooke Wilson
1080 Cannonade Court
Gahanna, OH 43230

Charge No: 532-2022-02113

EEOC Representative:          Legal Unit
                             (267) 589-9707

---

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 532-2022-02113.

On behalf of the Commission,

Digitally Signed By: Dilip Gokhale
09/24/2022
Dilip Gokhale
Director

**EXHIBIT**

tabbies®

_A_